**James WALLER, et al., Plaintiffs,**

v.

**Bernard BUTKOVICH, et al., Defendants.**

**Civ. A. No. C–80–605G.**

United States District Court, M.D. North Carolina, Greensboro Division.

April 17, 1984.

---

P. Lewis Pitts, Jr., Greensboro, N.C., Carolyn McAllaster, Durham, N.C., Dan Sheehan, Washington, D.C., Stewart Kwoh, New York City, Dennis Cunningham, Chicago, Ill., James McNamara, Columbus, Ohio, Susan Sturm, Amer. Civ. Liberties, New York City, for plaintiffs.

Virgil Griffin, David Wayne Matthews, Lawrence Gene Morgan, Coleman Blair

Pridmore, Lisford Carl Nappier, Sr., Jerry Paul Smith, Edward W. Dawson, Michael Eugene Clinton, Roy Clinton Toney, Roland Wayne Wood, Claude Matthew McBride, Jr., Rayford Milano Caudle, Jack Wilson Fowler, Jr., Harold Covington, Gorrell Pierce and Mark Sherer, pro se.

Kenneth W. McAllister, U.S. Atty., Greensboro, N.C., for Butkovich, Pelczar, Pence, Moses, Westra and Conroy.

Charles E. Nichols, Fred T. Hamlet, Kenneth Kyre, Jr., Jesse L. Warren, City Atty., Greensboro, N.C., for remaining defendants.

## MEMORANDUM

MERHIGE, District Judge.

■ The complaint filed herein arises out of a violent, conspiratorial attack that members of the Ku Klux Klan (Klan) and the American Nazi Party allegedly perpetrated against participants in an anti-Klan rally in Greensboro, North Carolina on November 3, 1979. The complaint charges various local, state, and federal government officials and agencies, as well as alleged members of the Klan and the Nazi Party, with complicity in the attack and in an ensuing cover-up of the alleged official involvement in the attack. There are sixteen plaintiffs and 87 named defendants.[1]

In its fourteen counts the complaint purports to state causes of action under federal civil rights statutes 42 U.S.C. § 1981, § 1983, § 1985(3) and § 1986, under the laws of North Carolina, and directly under the Constitution. *See Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Jurisdiction over the federal claims is premised on 28 U.S.C. § 1331 and § 1343. Plaintiffs additionally pray the Court to exercise jurisdiction over the state law claims under the doctrine of pendent jurisdiction.

There are a number of outstanding motions now before the Court. The plaintiffs have filed two motions to amend. The first seeks to add an additional plaintiff; the second seeks to add additional material to certain parts of the complaint. The government officials and agencies named in the complaint have filed motions pursuant to *Fed.R.Civ.P.* 12(b)(1), (2), (5) and (6), seeking dismissal of some or all of the claims against them. Finally, a number of the defendants who are described in the complaint as Klan or Nazi Party members have filed *pro se* motions for appointment of counsel. The parties having voluminously briefed the relevant issues and the Court having entertained argument thereon, these matters are now ripe for disposition.

## MOTIONS TO AMEND

■ Plaintiffs have moved to add an additional plaintiff, Claire Butler, to the complaint. Her claims, however, are undoubtedly barred by the appropriate statute of limitations. An amendment may be denied if it would prove futile, as in this instance. *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). The motion will be denied.

■ Plaintiffs have additionally moved to amend the text of the complaint in a number of respects. They seek to "specify further" that one of the defendants, District Attorney Schlosser, is charged with participation in a conspiracy in advance of the attack as well as in the cover-up. They seek also to "specify further" their claims for injunctive relief. In the Court's opinion, those amendments go substantially beyond the second amended complaint filed almost two years ago. No just reason for the delay has been given, and the proposed amendments would substantially prejudice the defendants. *See United States v.*

---

1. The complaint purports to name an unknown number of additional defendants whose specific identities are as yet unknown (the "John Doe defendants"). The John Doe defendants and their alleged involvement in the acts complained of are described only in the vaguest terms, and the time in which those persons, if discovered, might properly be served with process has long passed. Accordingly, the John Doe defendants will be dismissed from the action.

*Hougham,* 364 U.S. 310, 81 S.Ct. 13, 5 L.Ed.2d 8 (1960); Fed.R.Civ.P. 15(a). Additionally, the proffered further specifications are insufficient to remedy the lack of specificity in the present complaint as discussed *infra.*

The remaining proposed changes are mooted by virtue of the Court's resolutions of the pending motions to dismiss. The motion to amend will be denied.

## MOTIONS TO DISMISS

The government officials and agencies charged ("the moving defendants") have moved for dismissal on numerous grounds, which can be briefly summarized here. The agencies and the officials in their official capacities seek dismissal under Fed.R. Civ.P. 12(b)(1), contending that absolute sovereign immunity deprives the Court of jurisdiction over the action as against them. Defendant Schlosser, a District Attorney for the State of North Carolina, seeks dismissal on the ground of prosecutorial immunity. The federal employees sued in their individual capacities move for dismissal under Fed.R.Civ.P. 12(b)(2) and (5) for lack of personal jurisdiction and insufficiency of service of process.

All the moving defendants seek to have the entire complaint dismissed for failure to comply with the Fed.R.Civ.P. 8(a) requirement of a "short and plain" statement of the claim and for failure to comply with the Magistrate's order of February 26, 1982, which directed the plaintiffs to comply with Rule 8(a). Barring that, they seek dismissal under Fed.R.Civ.P. 12(b)(6) of the § 1985(3) conspiracy claim, on the ground that even if the allegations are taken to be true, they do not satisfy the requisite "discriminatory animus" element of a § 1985(3) cause of action. The federal officials move under Rule 12(b)(6) for dismissal of the § 1985(3) and § 1986 counts against them on the grounds that claims pursuant to those provisions are not actionable against federal officials. The defendants charged with complicity in the alleged cover-up move under Rule 12(b)(6) for dismissal of the § 1983, § 1985(3), and *Bivens* actions

against them on the ground that even if there were a cover-up, the complaint does not state any actionable injury resulting from it.

The local and federal law enforcement officials move under Rule 12(b)(6) to dismiss the § 1983, *Bivens,* § 1986 counts against them insofar as those counts charge them with failing to provide the plaintiffs police protection, to which, they argue, the plaintiffs had no actionable right. All of the moving defendants seek dismissal of the § 1981 count, under Rule 12(b)(6) for failure to state a claim under that statute. A number of the officials charged contend that they are included in the complaint solely because they occupied supervisory positions over their defendants; because, they argue, the doctrine of *respondeat superior* is not applicable to the causes of action asserted, they are entitled to dismissal under Rule 12(b)(6). The City of Greensboro seeks dismissal of the claims against it for failure to comply with a city ordinance requiring prompt notice to the city of claims against it.

All of the defendants urge the Court to decline to exercise pendent jurisdiction over the state law claims.

■ Before the Court proceeds to address these contentions, some further description of the parties to the case and of the allegations in the complaint is in order, as it may prove to be a useful preface to the discussions that follow. It should be noted that in this description as well as in the discussions that follow, excepting only the discussions of the service of process and jurisdictional contentions, the Court will accept the allegations of the complaint as true, as the law requires it to do. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Nothing herein should be taken as indicating any view on the validity of the allegations of the complaint. Any comments that might be interpreted as such should be understood rather as simply the consequence of the Court's adherence to the legally prescribed standard of review at this stage in the pleadings.

The complaint names 87 defendants. They can be grouped in various ways, but probably the most convenient groupings for the sake of these motions are those used in the complaint. In adopting those groupings for convenience reasons, the Court stresses that it does not pass any judgment on the accuracy of the labels used. In particular, in referring to certain defendants as "the Klan defendants" or "the Nazi defendants," the Court means only to signify those defendants who are alleged to be Klan or Nazi Party members.

The defendants are summarized in the following chart.

| | |
|---|---|
| **Private Defendants** | |
| Klan Defendants: | 13 Named Individuals |
| Nazi Defendants: | 7 Named Individuals |
| Informant Defendants: | Dawson, Butkovich |
| **Local Defendants** | |
| Greensboro Police Defendants: | 34 Named Officers, including Swing (Chief of Police) |
| Greensboro City Officials: | Melvin (Mayor), Osborne (City Manager), Lovelace (Director of Public Safety) |
| City of Greensboro: | )<br>) "Agency Defendants"<br>) |
| Greensboro Police Department: | |
| **State Defendants** | |
| State Bureau of Investigation (SBI) Defendants: | Starling (Director), Ray (Agent) |
| Hunt (Governor) | |
| Schlosser (District Attorney) | |
| Mitchell (Director of State Department of Crime Control and Public Safety) | |
| State of North Carolina | )<br>) "Agency Defendants"<br>) |
| SBI | )<br>) |
| Department of Crime Control and Public Safety | )<br>) |
| **Federal Defendants** | |
| Federal Bureau of Investigation (FBI) Defendants: | Webster (Director), Pence, Pelczar, Monahan, Moses, and Brereton (Agents) |
| Federal Bureau of Alcohol, Tobacco and Firearms (BATF) Defendants: | Dickerson (Director), Westra, Conroy (Agents) |
| Community Relations Service (CRS) Defendants: | Pompa (Director); Ensley (employee) |
| Attorneys General: | Civiletti, Bell, W. F. Smith |
| FBI | )<br>) |
| BATF | )<br>) |
| CRS (an agency at the Department of Justice) | )<br>) "Agency Defendants"<br>) |
| Department of Justice | )<br>) |

The complaint's description of the defendants fleshes out the summary contained in this chart in a number of respects worth noting here.

The "Greensboro police defendants" are mostly described as officers in the police divisions assigned to cover the Nov. 3 rally. The remainder are detectives or supervisory officers, some of whom are charged for their role in supervising the divisions assigned to cover the Nov. 3 rally, and some of whom are charged in connection with their roles in investigating the attack.

The "informant defendants" are described as persons who acted as "agent-provocateurs" within the Klan and the Nazi party. Dawson is described as a Klan member and as working for the Greensboro police and the FBI as an informant. Butkovich is described as an agent of the BATF who infiltrated the Nazi party and became an "agent-provocateur."

District Attorney Schlosser is named as the person who unsuccessfully prosecuted certain of the Klan/Nazi defendants on state law criminal charges.

All of the government officials named are sued both in their individual and official capacities.

The Court notes that while the complaint lists defendant Butkovich as an "informant defendant" rather than with the other federal defendants, the defendants' motions reveal that he is represented along with the other federal officials by counsel for the Department of Justice. Consequently, when the Court makes reference *infra* to "the federal defendants," such reference should be understood to include Butkovich.

The substance of the complaint begins with the statement that the plaintiffs, for a substantial period prior to and including November 3, 1979, had been "communists, labor organizers, and/or advocates of equal rights for black people," and were known to the defendants as such. The defendants harbored a pre-existing hostility against those three groups of people, and the complaint sets out background information purporting to evidence that pre-existing hostility.

The complaint recounts events that led up to the November 3 attack. In essence, it states that a communist organization, of which several plaintiffs were members, scheduled and publicly announced an anti-Klan/Nazi protest march to take place on November 3, 1979. Upon learning of the scheduled rally, the Klan and Nazi defendants, along with various named agents of the Greensboro Police, the FBI, and the BATF, including the two informant defendants, formed and agreed upon a plan. The crux of the plan was that the Klan and Nazi defendants would attack the participants, and the police defendants would fail to protect them and would otherwise facilitate the attack. Various defendants met and communicated on a number of occasions and committed overt acts in support of the plan.

In addition to the Klan and Nazi defendants, the official defendants and the informant defendants took various unlawful steps outlined in the complaint, in preparation for the attack. The informant defendants Dawson and Butkovich actively participated in planning the attack. Their superiors in the FBI and BATF were "fully aware" of their roles and "permitted, encouraged and/or failed to prevent their activity."

The Greensboro Police and named federal agents had full advance knowledge of the planned attack and failed to take any steps to prevent it or to warn the plaintiffs.

The complaint sets out the events of November 3, 1979 in some detail. Suffice it to say that the Klan and Nazi defendants brutally attacked the plaintiffs *en masse*, killing some and wounding others. Greensboro police, FBI and BATF defendants monitored the approach of the Klan/Nazi attack vehicles, and yet failed to take any steps to prevent it. The Greensboro police officers responsible for providing police protection were deliberately absent at the crucial time. The attack proceeded unhampered, and many of the attackers were able to flee because the Greensboro police de-

fendants intentionally delayed efforts to apprehend them.

Finally, the complaint states that the defendants charged with complicity in the attack, along with named additional officials including the CRS defendants, the state defendants, and the City of Greensboro officials, "engaged in a course and pattern of activities designed to conceal the nature of the November 3 attack" and the involvement of the law enforcement officials therein.

Acts taken in furtherance of the cover-up design included the arrest, on baseless charges, of a number of the plaintiffs; some were arrested immediately after the attack and some at a later time. Dismissal of these state criminal charges came about when the Klan/Nazi defendants were acquitted of the charges against them. To further the cover-up of official involvement, District Attorney Schlosser and others assisting him in the state criminal prosecutions failed in several ways to pursue those prosecutions vigorously. Other acts taken in furtherance of the cover-up are described in the complaint and will be summarized as necessary, *infra.*

The complaint charges that the defendants who occupied supervisory governmental positions maintained a number of policies and practices that contributed to the deprivations of the plaintiffs' rights. *Inter-alia,* the supervisory personnel failed to screen, train, and supervise their employees and informants adequately regarding the official duties implicated in the attack and the cover-up.

The complaint charges that by the aforementioned actions the defendants deprived them of equal protection of the laws and of their equal rights, privileges and immunities under the First, Fifth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

All of the defendants, except for a few of the supervisory officials, are charged with participation in a conspiracy to deprive the plaintiffs of their equal rights, in violation of 42 U.S.C. § 1985(3). The conspiracy supplies, as well, the basis for a claim against the city and state officials under 42 U.S.C. § 1983 and against the federal officials directly under the Constitution. *See Bivens, supra.*

The Greensboro Police defendants are charged with failing to protect the plaintiff's exercise of their First Amendment rights in violation of 42 U.S.C. § 1983. They and the FBI and BATF defendants are charged with failing to prevent the § 1985(3) conspiracy despite their advance knowledge of the attack and their power to prevent it, in violation of 42 U.S.C. § 1986. The federal defendants are also charged in a *Bivens* count with failing to prevent the attack.

In several § 1983 and *Bivens* counts, the complaint charges the government officials in supervisory positions with adhering to enumerated unconstitutional policies and practices, including failure to train and supervise their subordinates adequately. The complaint also charges virtually all the defendants in a count pursuant to 42 U.S.C. § 1981. Finally, the complaint includes state law claims against various defendants for wrongful death, battery, false arrest and malicious prosecution, and abuse of process.

The Court will proceed to consider *in seriatim* each of the moving defendants' contentions heretofore summarized.

SOVEREIGN IMMUNITY

The complaint names nine local, state, and federal agencies as defendants, noted on the chart, *supra,* as "agency defendants." Additional defendants are all the governmental officials in their official capacities. These defendants have moved to be dismissed from the complaint on the grounds that they are immune from suits seeking monetary relief and that the complaint does not sufficiently state a claim for any other form of relief.

For the most part, the Court agrees with both contentions. Injunctive relief is requested in the instant complaint only in the final sentence, wherein the plaintiffs "request that the court issue such other orders and grant such declaratory, equitable

and other additional relief as the interest of justice may require." No request for specific injunctive relief is made.

■ Nor are the facts alleged sufficient to sustain injunctive relief. The plaintiffs have failed to allege facts suggesting that they are presently sustaining some direct injury or that there is a real and immediate threat of such injury in the future. Such facts are the necessary predicates to a grant of injunctive relief. *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *Buie v. Jones,* 717 F.2d 925, 927-8 (4th Cir.1983). The attack is over. The only allegedly continuing violations of the plaintiffs' rights are the cover-up activities, and those charges will be mooted by the disposition of the damages portion of this action.

■ The sovereign immunity of the United States, unless waived, protects the federal agencies and the federal officials in their official capacities from liability for money damages. Congress has waived the federal government's immunity only as to claims brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* It is uncontested that this action was not brought pursuant to the provisions of that Act. The CRS, FBI, BATF, Department of Justice as well as the federal employees in their official capacities will be dismissed.

■ The sovereign immunity of North Carolina and the Eleventh Amendment to the U.S. Constitution provide the state agencies and the state officials in their official capacities with similar immunity, with the exception that Congress may force a waiver on the states for the purpose of enforcing the Fourteenth Amendment. *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Congress did not force such a waiver on the states when it enacted 42 U.S.C. § 1983. *Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979), *Reimer v. Smith,* 663 F.2d 1316 (5th Cir.1981). Hence, the Eleventh Amendment bars recovery of damages as asserted herein against North Carolina, its agencies, and its officials in their official capacity. The State of North Carolina, the SBI, the Department of Crime Control and Public Safety and the state employees in their official capacities will be dismissed.

■ The City of Greensboro, on the other hand, and its employees in their official capacities come within the meaning of the word "person" in 42 U.S.C. § 1983 and are not protected by sovereign immunity. *Owen v. City of Independence,* 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980); *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The motions to dismiss them will be denied. On the strength of the representation, from counsel for the City of Greensboro, that the "Greensboro Police Department" is not an independent legal entity, the Police Department will be dismissed from the complaint as a separate defendant. All liability charged against it will be deemed to be charged against the City of Greensboro.

## PERSONAL JURISDICTION

The various federal defendants seek dismissal pursuant to Fed.R.Civ.P. 12(b)(2) and (5), contending on several grounds that the Court has no personal jurisdiction over them and/or that they were not properly served with process. The Court agrees that certain of the individual federal defendants should be dismissed on these grounds.

■ Attorney General Bell was never served with process. Nor was Agent Monahan of the FBI. They will be dismissed as defendants. Attorney General Civiletti was not served in his individual capacity and will also be dismissed.

■ Attorney General W.F. Smith was never served personally, nor was Robert Ensley of the CRS. Service on them was attempted solely through service on the United States Attorney, as their agent. The defendants have argued, convincingly, that such service is adequate only against a federal officer sued in his official capacity. *Stafford v. Briggs,* 444 U.S. 527, 100 S.Ct.

774, 63 L.Ed.2d 1 (1980), *construing* 28 U.S.C. § 1391(e). Smith and Ensley will be dismissed.

■ Two of the federal defendants were served by United States Marshals within the territorial limits of North Carolina. They are FBI Agents Pelczar and Brereton, both resident agents in North Carolina. The service effected on them complies fully with Fed.R.Civ.P. 4. No serious objection can be made to the manner of service on them or to the Court's jurisdiction over their persons. As to them, the motions premised on Fed.R.Civ.P. 12(b)(2) and (5) will be denied.

Service on the remaining federal defendants was attempted in accordance with the law of the forum state, North Carolina. Fed.R.Civ.P. 4(c)(2)(C)(i) provides for such service as an alternative to the forms of service specified elsewhere in the federal rule.

■ When service is made pursuant to the forum state's law, both the service of process requirements and the personal jurisdiction requirements of state law must be met. North Carolina's service of process rules are contained in N.C.G.S. § 1A–1, North Carolina Rule 4(j) (1980) (modified and repealed in part, 1981). As to personal jurisdiction, North Carolina's long-arm statute is found at *N.C.G.S.* § 1–75.4. That provision has been construed as reaching as far as the due process limits of the U.S. Constitution will allow it. *Dillon v. Numismatic Funding Corp.*, 291 N.C. 674, 231 S.E.2d 629 (1977).

Accordingly, the tests to be applied regarding the remaining federal defendants herein are: Was North Carolina Rule 4(j) complied with? If so, would the exercise of personal jurisdiction comport with due process?

■ Three defendants (Pence, Westra, and Moses) were served within North Carolina by certified mail addressed to them in their individual capacities at their offices within North Carolina. The returns show that service was received, accepted, and signed for.

The Court finds that the objections to this form of service are meritless. Defendants have argued a convoluted non-obvious construction of North Carolina Rule 4(j)(1)(c), contending that service by certified mail is allowable only at a person's home, not at his or her office. The language of the rule makes no reference to home or office that is relevant here; it requires simply that a complaint sent by certified mail be "addressed to the party to be served, and delivering to the addressee only." Policy considerations likewise do not support the defendants' proposed construction: indeed, many defendants sued in connection with their work might prefer that plaintiffs not be encouraged to seek out their home addresses. The defendants offer no case support for their asserted construction. They do not deny having received the copies of the complaint that were received by certified mail at their respective offices. The Court finds that they were adequately served.

These three defendants object also, along with the other federal defendants, to the Court's exercise of personal jurisdiction over them. The argument begins with the Supremacy Clause of the United States Constitution and ends, if adopted, with the result that no court would ever have personal jurisdiction over any federal employee who was not personally served by United States Marshals within the forum state, even if the employee resides and works in the forum state. Whatever merit there may be in such a contention escapes the Court's comprehension.

■ Two defendants (Conroy and Butkovich), employees in the BATF's Cleveland, Ohio office, were served personally by United States Marshals in Cleveland. The Court finds that they were properly served. North Carolina Rule 4(j)(9) allows for personal service on out-of-state defendants when the defendants are within the reach of the state's long-arm statute.

As to defendant Butkovich, there is no doubt that long-arm jurisdiction does not offend due process. The plaintiffs allege,

and the defendants apparently concede, that Butkovich was on special assignment in North Carolina, conducting an undercover investigation of certain Nazi Party members, around the time of the attack. The plaintiffs allege, *inter alia,* that he infiltrated the Nazi party, and that, as an "informant-provocateur," he actively participated in the planning of the attack.

 Due process requires only a showing of "some act [related to the cause of action alleged] by which the [non-resident] defendant purposefully avails [himself] of the privilege of conducting activities within the Forum State...." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283 (1958). Generally, the commission of a single tortious act within the forum state is sufficient. *See Columbia Briargate Co. v. First National Bank in Dallas,* 713 F.2d 1052, 1057 (4th Cir.1983), and cases cited therein. The Court concludes that defendant Butkovich's alleged activities in North Carolina in 1979, are a sufficient basis for denying the motion to dismiss him on these grounds at this time.

The Court concludes similarly as to defendant Conroy, although admittedly the issue is closer as to him. Conroy is the agent in charge of the Cleveland BATF Office, to which Agent Butkovich was regularly assigned during his special assignment in North Carolina. Plaintiffs allege that Conroy was Butkovich's supervisor; that he was "fully aware" of Butkovich's participation in the planned attack before it took place; and that he took no steps to prevent the attack. Importantly, the plaintiffs allege also that Conroy "monitored" the approach of the Klan/Nazi attack caravan toward the rally site. A fair implication of this allegation is that he was present in North Carolina at the time.

 The defendants have not denied that Conroy was present in North Carolina at the time of the attack or otherwise in connection with the alleged torts. Absent affidavits or other evidentiary submittals from the defendants, the Court may decide the issue on the pleadings. *See Gemini*

*Enterprises, Inc. v. WFMY Television Corp.,* 470 F.Supp. 559, 565 (M.D.N.C. 1979); *McLaughlin v. Copeland,* 435 F.Supp. 513, 529–533 (D.Md.1977). On the strength of the allegation that Conroy was present in North Carolina in connection with the alleged tort, the Court concludes that he, too, is within the reach of the permissible long-arm jurisdiction.

It is to be kept in mind that the Court's instant rulings are premised solely on unrefuted pleadings. Factual determinations may well warrant a different conclusion.

The final three federal defendants are Webster, Pompa, and Dickerson, who are Directors of the FBI, CRS, and BATF respectively. They were served out-of-state by certified mail, addressed to them in their individual capacities at their respective offices. While the Court finds the manner of service adequate, the objections to the exercise of personal jurisdiction may be well taken.

The objections to the manner of service on these out-of-state defendants parallel those made for the in-state defendants served by certified mail: defense counsel argues that North Carolina Rule 4(j)(9) (governing out-of-state service by mail) allows service by certified mail only at a person's home address, not at his or her office address. This proposed construction of Rule 4(j)(9) has not improved by repetition. It is as unsupported as defendants' contention dealing with North Carolina Rule 4(j)(1)(c) (governing in-state service by mail), and the Court rejects it.

Turning to the issue of personal jurisdiction, the complaint does not allege that any of these three defendants were ever personally present in North Carolina in connection with plaintiffs' causes of action. They are alleged to be liable only for their subordinates' acts and/or as co-conspirators with those who allegedly did act in North Carolina. Consequently, personal jurisdiction over them is available, if at all, only pursuant to the "conspiracy theory of personal jurisdiction."

That theory holds that in some circumstances an alleged co-conspirator's presence in the forum state is enough to justify exercise of personal jurisdiction over the out-of-state co-defendant who had no contacts of his own with the forum state. *See McLaughlin v. McPhail,* 707 F.2d 800, 806–807 (4th Cir.1983); *Gemini Enterprises, Inc. v. WFMY Television Corp., supra,* 470 F.Supp. at 564–565 and cases cited therein.

The Court of Appeals for the Fourth Circuit has neither accepted nor rejected this theory to date. *See McLaughlin v. McPhail,* 707 F.2d at 807. Defendants have cited no case support for an outright rejection of the theory, however, and the Court is convinced from the facts and reasoning in *Gemini* that in some circumstances, adherence to this theory would be appropriate.

■ Applying the *Gemini* test to the instant case, jurisdiction may be exercised over Webster, Dickerson, and Pompa if and only if they had co-conspirators who performed substantial acts in furtherance of an unlawful conspiracy in North Carolina and they "knew or should have known" that those acts would be performed in North Carolina. *Gemini,* 470 F.Supp. at 564. The complaint does not allege any such facts as to Pompa. His involvement was only with certain acts in furtherance of the "cover-up conspiracy," and the complaint does not allege that any of those acts took place in North Carolina. He will be dismissed.

The complaint alleges that both Webster and Dickerson were "fully aware," in advance of the attack, of the roles of their alleged subordinates/co-conspirators in the attack. If this were proven to be true, and if Webster and Dickerson were proven to be members of the conspiracy, then they could be subjected to personal jurisdiction in North Carolina under the conspiracy theory. The Court anticipates, however, from counsel's argument, that these defendants may be prepared to deny by affidavit any such advance knowledge of and any participation in the conspiracy. By order issued with this memorandum, the Court will grant them leave to do so, if they be so advised, within an appropriate time.

If Webster and Dickerson file appropriate affidavits, the plaintiffs will be granted leave to respond with a *prima facie* showing by counter affidavits that Webster and Dickerson were members of the conspiracy and that they had the requisite advance knowledge of the co-conspirators' acts in North Carolina. *See Gemini,* 470 F.Supp. at 565; *McLaughlin v. McPhail,* 707 F.2d at 807. The Court will not permit discovery to proceed against these defendants, however, until the plaintiffs make such a *prima facie* showing. The relevant issues of jurisdictional fact would not in all likelihood be resolvable through any form of limited discovery, and it would be inappropriate to force these defendants to remain in the case throughout the discovery on the merits unless personal jurisdiction is first established. The Court's authority to decline such discovery is clear. *McLaughlin v. McPhail, supra* at 806–807. If Webster and Dickerson file denials by affidavit, and the plaintiffs cannot make the required *prima facie* showing by counter affidavits without such discovery, these defendants will be dismissed.

To summarize, the following federal defendants will be dismissed on personal jurisdiction grounds: Bell, Monahan, Civiletti, Smith, Ensley, and Pompa. Webster and Dickerson will be dismissed on these grounds if they file affidavits as heretofore discussed and the plaintiffs do not successfully contradict them; in the meanwhile, the motions to dismiss these two defendants on all grounds asserted will be continued under advisement, and discovery against them personally will be stayed. The motions to dismiss the following federal defendants for lack of jurisdiction will be denied: BATF agents Westra, Conroy and Butkovich, and FBI agents Pence, Moses, Pelczar, and Brereton. Other grounds for dismissal asserted by these defendants are addressed, *infra.*

## PROSECUTORIAL IMMUNITY

District Attorney Schlosser argues that he is entitled, as he is, to absolute prosecu-

torial immunity from all the claims lodged against him in this action.

 The complaint charges Schlosser with violations of 42 U.S.C. § 1981, § 1983, and § 1985(3). The factual allegations on which these claims are based largely relate to his role in prosecuting certain of the Klan/Nazi defendants on state criminal charges. The complaint asserts that he failed to prosecute them vigorously, failed to call relevant witnesses, etc. It alleges that he conducted the prosecution in that manner as a means to further the cover-up of official involvement in the attack. It charges that he also made false and inflammatory public statements to further the cover-up. The complaint does not charge Schlosser with participation in or advance knowledge of the attack conspiracy.

With the possible exception of the inflammatory public statements, all of these allegations are premised on acts within the prosecutorial function and hence are barred by absolute immunity. *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). False, inflammatory public statements are not within the prosecutorial function and hence such allegations might strip the prosecutor of his absolute immunity in an appropriate case. *Hampton v. Hanrahan*, 600 F.2d 600, 632–633 (7th Cir. 1979), *modified on other grounds* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980); *but cf. Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

 In the instant case, however, the complaint does not describe the allegedly false and inflammatory public statements sufficiently to enable Schlosser or the Court to evaluate whether his immunity covers them. The plaintiffs have merely characterized unidentified statements as false and inflammatory. "The immunity doctrine would be of little value if such characterization .... could force the prosecutor to stand trial." *Weathers v. Ebert*, 505 F.2d 514, 517 (4th Cir.1974), *quoting Hampton v. City of Chicago*, 484 F.2d 602, 608 (7th Cir.1973).

The Court concludes that the complaint does not allege sufficient facts to show that plaintiffs' claims come within any exception to the traditional rule of prosecutorial immunity. *Weathers v. Ebert*, 505 F.2d at 516. Schlosser's motion to dismiss will be granted.

 The federal defendants argue that they, too, are absolutely immune from the claims against them. The plaintiffs have not contested this assertion in their brief as to the state law claims, and the Court concludes that the federal defendants are, while acting within the perimeters of their respective lines of duty, absolutely immune from state or common law tort liability. *See Barr v. Matteo*, 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959); *Birnbaum v. United States*, 588 F.2d 319 (2nd Cir.1978); *Miller v. De Laune*, 602 F.2d 198, 200 (9th Cir.1979). Counts Eleven through Fourteen will be dismissed as to the federal defendants.

 Regarding the federal law counts, the federal defendants argue that they are entitled to absolute prosecutorial immunity. With the exception of Brereton, however, all the federal defendants now being considered are charged with participation in the attack conspiracy and/or with failure to prevent the attack despite advance knowledge of it. The scope of prosecutorial immunity turns on whether the acts charged were within the prosecutorial function, not on the status of the actor. *Hampton v. Hanrahan*, 600 F.2d at 631. These allegations describe activities unquestionably outside the prosecutorial function.

Brereton's alleged involvement arises solely from his role in the federal investigation following the attack. The complaint does not charge him with pre-attack knowledge or participation. It is arguable that such investigative work would be protected by absolute prosecutorial immunity. *See Ross v. Reed*, 719 F.2d 689, 694–695 n. 5 (4th Cir.1983); *Segarra v. McDade*, 706 F.2d 1301 (4th Cir.1983); *but cf. Hampton v. Hanrahan*, 600 F.2d at 631–632; *Gray*

*v. Bell*, 712 F.2d 490, 499–502 (D.C.Cir. 1983).

The Court need not decide this issue, however, because it has concluded that the complaint should be dismissed as to Brereton on other grounds, to wit, deficiencies in the pleadings against him. *See infra.* Indeed, the vagueness of the pleadings against Brereton would make the task of applying the law to his immunity claim difficult if not impossible.

■ The federal defendants' arguments may also be construed as seeking dismissal on the grounds that their qualified immunity under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) bars this action. Claims of qualified immunity, however, are not yet properly before the Court. The defendants must affirmatively plead such claims in their answers and then raise them in properly supported motions for summary judgment. *Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Harlow v. Fitzgerald*, 457 U.S. at 815, 102 S.Ct. at 2737. On the basis of the record now before the Court, the federal defendants' immunity claims will be denied, except as heretofore stated.

## SUFFICIENCY OF PLEADINGS UNDER FED.R.CIV.P. 8(a)

The defendants argue that the complaint should be dismissed because it fails to state specifically the facts on which the allegations are based. Whatever the deficiencies of previous versions of the complaint may have been, the Court concludes that, with a few exceptions, the second amended complaint is sufficient to avoid dismissal on this ground.

■ Fed.R.Civ.P. 8(a) as construed in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), requires only " 'a short and plain statement of the claim' sufficient to give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." 355 U.S. at 47–48, 78 S.Ct. at 103. The complaint need not disclose precisely the basis of the claim or narrowly define the disputed facts and is-

sues; various discovery devices are available for that purpose. *Id.* Moreover, the complaint should not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S.Ct. at 102.

■ The defendants suggest that a more rigorous test should be applied in the instant case because it is a civil rights case. The Court disagrees. The cases on which the defendants rely for this proposition come primarily out of the Third Circuit. Apparently the Court of Appeals for that Circuit has adopted a more stringent test. *See, e.g., Kauffmann v. Moss*, 420 F.2d 1270, 1275 (3rd Cir.1970). The Court of Appeals for the Fourth Circuit, to whose opinions this Court is bound, has not adopted that position; nor have the majority of the other circuits. *See, e.g., Gordon v. Leeke*, 574 F.2d 1147, 1151 (4th Cir.1978); *Johnson v. Mueller*, 415 F.2d 354, 355 (4th Cir.1969); *Kauffmann v. Moss*, 420 F.2d at 1275 n. 13.

■ The defendants also imply, relying on *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) and its predecessors, that special, rigid pleading requirements should be applied to suits seeking damages from government officials. It is true that the Supreme Court in *Harlow* emphasized its "expectation that insubstantial lawsuits need not proceed to trial." 457 U.S. at 808, 102 S.Ct. at 2733. Its only reference to pleading requirements, however, consists of a statement of the standard pleading rule and an exhortation to the lower courts to follow it:

> Insubstantial lawsuits can be quickly terminated by federal courts alert to the possibilities of artful pleading. Unless the complaint states a compensable claim for relief ..., it should not survive a motion to dismiss.

*Id.*, quoting *Butz v. Economou*, 438 U.S. 478, 507–508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978).

■ This statement does not purport to establish extraordinary pleading require-

ments for cases against government officials. The issue addressed in *Harlow* was a government official's claim of qualified immunity, raised in a motion for summary judgment. The power of the *Harlow* opinion to protect government officials from insubstantial lawsuits lies primarily in its resolution of that issue. "This holding [*Harlow*] was intended to facilitate the resolution of insubstantial claims against government officials *by summary judgment*." *McElveen v. County of Prince William*, 725 F.2d 954 (4th Cir.1984) (emphasis added). As discussed *supra*, the burden to plead qualified immunity lies with the defendants. An otherwise adequate complaint need not fulfill any special pleading requirements in anticipation that the answers may raise qualified immunity defenses. *See generally Gomez v. Toledo*, 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980). The Court must measure the instant complaint against the *Conley v. Gibson* standard.

## A. Conspiracy

▮ The Court is also satisfied that no heightened pleading requirements come into play simply because the complaint charges a conspiracy. However, the *Conley v. Gibson* requirement that the defendant be given "fair notice of what the plaintiff's claim is and the grounds on which it rests" may take on special import when a conspiracy is alleged.

▮ In most cases, a bare conclusory allegation of "conspiracy" or "concerted action" will not suffice. The plaintiffs must expressly allege an agreement or make averments of "communication, consultation, cooperation, or command" from which such an agreement can be inferred. *See Weathers v. Ebert*, 505 F.2d 514, 517 (4th Cir.1974). Allegations that the defendants' actions combined to injure the plaintiffs are not a sufficient basis from which to imply a conspiracy. *See Davis v. Sprouse*, 405 F.Supp. 45, 46 (E.D.Va.1975).

▮ Additionally, the plaintiffs must make "specific factual allegations connecting the defendant to the injury . . . ." *Si-*

*gler v. LeVan*, 485 F.Supp. 185, 196 (D.Md. 1980); *see also Ostrer v. Aronwald*, 567 F.2d 551 (2nd Cir.1977). On the other hand, an overt act need not be pleaded against each defendant, because a single overt act by just one of the conspirators is enough to sustain a conspiracy claim even on the merits. *See Vietnamese Fishermens Association v. Knights of the Ku Klux Klan*, 518 F.Supp. 993 (S.D.Tex.1981). Nor are the plaintiffs required to allege exactly how the agreement was made—i.e. they need not allege exactly where and when, and with what words, the agreement was formed. *Magayanes v. Chicago*, 496 F.Supp. 812, 815–816 (N.D.Ill.1980); *Reichardt v. Payne*, 396 F.Supp. 1010 (N.D. Calif.1979), *aff'd in part and remanded on other grounds*, 591 F.2d 499 (9th Cir. 1979). Conspiracies are by their very nature secretive, and the victims thereof are unlikely to have access to such facts before bringing suit. *See Vazquez v. Ferre*, 404 F.Supp. 815, 822 (D.N.J.1975). All that can be required at the pleading stage is that a defendant be given notice of how he is alleged to have participated in the conspiracy, so that he may intelligently prepare his answer and defense.

▮ The instant complaint gives the Court little difficulty under these standards in regards to the Greensboro police and the federal defendants who joined the conspiracy *before* the attack. The complaint sets out in Paragraph 34 that each of them agreed to the plan for the attack. In the succeeding paragraphs it satisfactorily specifies the involvement of each.

▮ Regarding the federal defendants in particular, the complaint specifies that Butkovich, an agent of the BATF, acted as an "agent-provocateur," and that as such, he joined the Nazi Party and "actively participated in the planning of the attack and encouraged Nazi defendants to purchase, carry and use weapons in the attack." Complaint, ¶ 7b and ¶ 37. Informant Dawson was working as an informant for the FBI as well as the Greensboro police, and he "took a leadership role in planning and

recruiting for the attack." Complaint, ¶ 7a and ¶ 37. All of the other federal defendants charged with pre-attack participation acted in supervisory capacities over Butkovich or Dawson. They were fully aware of Dawson's and Butkovich's roles and "permitted, encouraged and/or failed to prevent their activity." Complaint, ¶ 37. Most of these defendants "monitored the approach" of the Klan/Nazi attack vehicles and failed to take any action to stop them, despite their knowledge of what was about to happen. Complaint, ¶ 50.

Without question these allegations are factually sufficient for the claim against the federal defendants under 42 U.S.C. § 1986. *See Peck v. United States*, 470 F.Supp. 1003, 1012 (S.D.N.Y.1979).

*Peck* held, however, on the facts therein (which were similar but not identical to those alleged here), that a § 1985(3) claim against the federal officers was not stated. In *Peck*, the FBI agents were alleged to have known through their informant, Rowe, of an impending Klan attack on a group of "Freedom Riders" and of the local police's alleged agreement to arrive 15 minutes "late" so that the attack might go forward unhampered. In support of the § 1985(3) claim against the FBI agents, the complaint alleged only that the defendants "approved the acts of Rowe and likewise participated in and furthered the ... conspiracy." *Id.* The Court concluded that mere knowledge is insufficient to sustain a claim under § 1985(3), and it dismissed the FBI agents from that count. *Id.*

■ This Court agrees with *Peck*'s approach but finds the facts alleged herein distinguishable on the § 1985(3) claim. At least one of the informants herein was actually a federal employee (Butkovich). The supervisory defendants herein are alleged to have "encouraged, permitted, and/or failed to prevent" the activities of Butkovich and Dawson. While the latter two alternatives—permission and failure to prevent—might only be sufficient to sustain the § 1986 count, the "encouragement" alternative could sustain the § 1985(3) count as well. In addition, the

alleged "monitoring" presence of most of these defendants at the attack could conceivably support the § 1985(3) count.

Although the issue is not as clear as some, the Court concludes that these allegations sufficiently distinguish this case from *Peck* to allow the § 1985(3) count to remain in the case during discovery along with the § 1986 count. Whether the plaintiffs can muster any evidence in support of either count against these defendants remains to be seen. For now, the motions of these defendants to dismiss for failure to comply with Fed.R.Civ.P. 8(a) will be denied.

### B. Cover-up

The complaint alleges that some additional local, state and federal defendants (the "cover-up defendants") joined only the post-attack conspiracy to cover up the nature of the attack. Excluding defendants who have already been dismissed on other grounds or whose motions have been continued under advisement, the cover-up defendants are as follows: Greensboro police defendants Batemen, Ozment, and Williams; the City of Greensboro; Greensboro City Officials Melvin, Osborne, and Lovelace; state officials Mitchell, Starling, and Ray; and FBI Agent Brereton. Other defendants charged with complicity in the cover-up are also charged with complicity in the attack; as against them, the Court has already found the pleadings to be sufficient.

■ The cover-up allegations are more troublesome than the attack allegations. Paragraph 52 of the complaint contains the general cover-up claim. It does not allege a general agreement to perpetrate a cover-up. Rather, it alleges only that the various defendants "engaged in a course and pattern of activities designed to conceal..." The coincidental concurrence of defendants' actions does not a conspiracy make. *Davis v. Sprouse*, 405 F.Supp. at 46. Other paragraphs remedy this omission as to some but not all of the cover-up defendants, as discussed *infra*.

More importantly, the complaint does not make sufficiently specific factual allegations against certain of the cover-up defendants to give them fair notice of the charges against them.

■ The only specific accusation against Mitchell, the Director of the North Carolina Department of Crime Control and Public Safety, is that he "made false and inflammatory public statements and engaged in disruptive and illegal activities to promote hostility toward plaintiffs...." Complaint, ¶ 56. The statements are not identified by time, date, content, or otherwise, nor does the complaint state in what manner he spoke falsely. The same allegation is levelled against defendant Lovelace, the Director of the Department of Public Safety of the City of Greensboro; again, no specifics are provided.

■ Defendants Ray and Starling, both SBI officials, are not mentioned by name in any of the paragraphs containing specific allegations about the cover-up. Presumably they are included in the paragraph that accuses all the cover-up defendants of testifying falsely or incompletely concerning the attack or otherwise misrepresenting or withholding relevant evidence from one or more of the seven agencies listed as having conducted investigations of the attack. Complaint ¶ 61.

This charge is not sufficiently specific to give the defendants the fair notice to which they are entitled.[2]

■ Brereton, an FBI agent, is said to have been involved in the FBI "investigation and cover-up" of the attack. Complaint ¶ 11(d) and ¶ 62. The complaint does not allege any agreement or cooperation between him and other defendants, nor does it sufficiently apprise him of how his role in the investigation is alleged to have

constituted participation in a cover-up conspiracy.

■ On the other hand, the complaint states with particularity the charges against Batemen, Ozment, and Williams of the Greensboro Police Department. It alleges that they conducted a sham investigation and prepared a false administrative report attempting to exonerate the police, all under the direction of Police Chief Swing. The element of "agreement" can be inferred from their alleged cooperation with each other and with Chief Swing. See *Weathers v. Ebert*, 505 F.2d at 517. The report is identified by the date of its public release. These defendants have been sufficiently notified of their alleged complicity in a cover-up conspiracy.

■ Similarly, Melvin and Osborne, the Greensboro Mayor and City Manager respectively, are said as part of the cover-up to have assisted the City of Greensboro, by its City Council, in issuing several proclamations that commended various police actions. The agreement element can be inferred from these facts, and the complaint sufficiently identifies the proclamations by content. The Court finds the cover-up allegations to be sufficient against the City, Melvin, and Osborne.

In summary, the cover-up conspiracy claims, which are contained in Counts One, Two, and Eight,[3] will be dismissed against Mitchell, Starling, Ray, Lovelace and Brereton. The Court notes that Brereton is not charged in any other counts; he will be dismissed from the action. The other above named defendants are charged in other counts still to be addressed.

## C. Policies and Practices

Counts Four, Five, Nine, and Ten of the complaint charge that a number of the

---

**2.** In addition, testimony before a Grand Jury, for example, would be protected by witness immunity. *Burke v. Miller*, 580 F.2d 108 (4th Cir. 1978), cert. den. 440 U.S. 930, 99 S.Ct. 1268, 59 L.Ed.2d 487 (1979).

**3.** The Court notes that determining which counts stated causes of action for the cover-up conspiracy, and against whom, was no easy feat.

This problem is illustrative of more general difficulties with the complaint, which is no model of clarity. The failure to set out separate claims in separate counts was especially troublesome and has caused the Court—and presumably the defendants as well—much unnecessary effort.

defendants occupying policy-making positions in government agencies promulgated and/or tolerated unconstitutional policies and practices in their agencies that caused, at least in part, the damages flowing from subordinates' alleged misconduct.

Counts Four and Nine charge named officials with adhering to the unconstitutional policies and practices set out in ¶ 67 and ¶ 68 of the complaint.[4] Paragraph 67 lists six "policies," ranging from "failure properly and adequately to screen for hiring, train, supervise and discipline their officers, agents and informants," to "cooperation with and/or acquiescence in illegal, unconstitutional anti-labor activities and operations carried on by ... textile and other industrial and business concerns in and around Greensboro ... against radical labor organizers and activists...." Paragraph 68 states that the cover-up activities described elsewhere in the complaint represented the high level policies of each of the agencies allegedly involved therein.

Counts Five and Ten are narrower; they simply repeat the supervisory practices claims contained in Counts Four and Nine, in more specific form.

The defendants object that the policy/practices counts are too conclusory and vague to satisfy the appropriate pleading requirements. The Court finds their position well-taken as to all but the supervisory practices claims, as hereinafter discussed.

■ The complaint states no factual grounds whatsoever for the charge of collusion with Greensboro textile concerns quoted *supra*. Nor does it allege how this "policy" contributed to any violation of the plaintiffs' constitutional rights. *See Polk County v. Dodson*, 454 U.S. 312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981). In the Court's view, the complaint does not fairly notify the defendants of what this claim is, nor of the grounds on which it

rests. *Conley v. Gibson*, 355 U.S. at 47–48, 78 S.Ct. at 102–103.

The other policy/practice claims itemized in ¶ 67 and ¶ 68, with the exception of the supervisory practices claims, are similarly conclusory and will be dismissed. Because the supervisory practices claims contained in Counts Four and Nine are repeated in Counts Five and Ten, the Court will dismiss Counts Four and Nine altogether.

Count Five purports to state a claim under 42 U.S.C. § 1983, for deficient supervisory practices, against the City of Greensboro; Greensboro's Director of the Department of Public Safety, Lovelace; Greensboro Police Officials Swing, Hampton, Gibson, Spoor, Comer, and Hightower; and State Officials Mitchell, Starling, Ray and Hunt. Count Ten purports to state a similar claim in a *Bivens* action against FBI Agents Pelczar and Pence; BATF Agents Westra and Conroy; and other defendants, some of whom are not now before the Court because it has already determined *supra* that their motions for dismissal will be granted. Some have motions which will be continued under advisement, *supra*.

The defendants move for dismissal of these counts for failure to comply with Fed.R.Civ.P. 8(a). They also raise other challenges to these claims which will be addressed in a separate section, *infra*.

■ Leaving aside, for the moment, the North Carolina officials, the Court concludes that the factual basis for these claims is clear. According to the complaint, these defendants occupied direct supervisory control over named subordinates whose misconduct is detailed elsewhere in the complaint. The fair implication of the complaint is that if these defendants had properly screened, trained, and supervised their named subordinates, those subordinates would not have acted as they did, and hence the constitutional violations would not have occurred.

---

**4.** Count Nine actually makes reference to ¶ 60 and ¶ 61 rather than ¶ 67 and ¶ 68, but a glance at the numbered paragraphs reveals that this was simply a typographical error. The parties' briefs all reflect this understanding, which the

Court takes to be correct. In any event, the Court's conclusion—that Count Nine must be dismissed—would not be altered if the Court assumed there had been no typographical error.

The Court concludes that these accusations fairly put these defendants on notice as to how they are alleged to have harmed the plaintiffs. While the complaint does not detail the deficiencies in their supervisory practices as much as hopefully pleadings would, the lack of detail is not fatal. Information on those practices is, presumably, peculiarly within the defendants' possession. Because discovery in this action has been stayed, the plaintiffs have not yet had the opportunity to explore what the defendants' supervisory practices were and how they might have contributed to the subordinates' conduct. If the supervisory practices allegations do not become clearer to the defendants as discovery proceeds, the Court will entertain appropriate motions at a later time. For now, at least in this regard, the pleadings suffice.

 That conclusion does not apply to the State officials named in Count Five —Hunt, Starling, Ray, and Mitchell. The complaint does not describe any misconduct on the part of persons named as their subordinates.[5] Aside from vaguely suggesting that unidentified SBI agents worked with informants and infiltrators, and that the SBI evidenced pre-existing hostility to the plaintiffs, the complaint makes virtually no mention of any North Carolina employees. In particular, it does not charge that any North Carolina agent participated in the attack or had advance knowledge of it. As the Court has already noted, the cover-up charges against North Carolina officials Mitchell, Starling, and Ray are hopelessly vague. The Court concludes that the complaint does not adequately notify the North Carolina officials of how their supervisory practices harmed anyone.

Count Five will be dismissed as to these four defendants.

## D. Summary

The Court notes that each of the charges against Hunt, Mitchell, Starling, and Ray have now been found to be insufficiently pleaded. They will be dismissed from the action, along with Brereton, regarding whom the only charge made was found to be insufficiently pleaded.[6]

Additionally, Counts Four and Nine will be dismissed. Finally, Lovelace will be dismissed from Counts One and Two, which purported to charge him in connection with the cover-up, but will remain in the case on other counts.

In all other respects, the motions to dismiss for failure to comply with Fed.R. Civ.P. 8(a) will be denied.

## § 1985(3) CONSPIRACY

The Supreme Court has held that a cause of action under 42 U.S.C. § 1985(3) requires the following four elements:

> (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Carpenters v. Scott,* —— U.S. ——, 103 S.Ct. 3352, 3356, 77 L.Ed.2d 1049 (1983), *Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 1798–99, 29 L.Ed.2d 338 (1971).

In addition, the Supreme Court has interpreted the statute to require that there

---

**5.** The complaint states that as Director of the North Carolina Department of Crime Control and Public Safety, Mitchell was responsible for policies and practices of "the SBI *and local police departments* and other agencies." (emphasis added). The Court takes notice of the fact that under North Carolina law Mitchell had no supervisory power over local police departments, except in "natural or man-made disasters or emergencies." *See N.C.G.S.,* § 143B–473 *et seq.* The Court need not accept the complaint's

averment when state law is clearly to the contrary. *See Avery v. County of Burke,* 660 F.2d 111, 113–114 (4th Cir.1981); *Vinnedge v. Gibbs,* 550 F.2d 926 (4th Cir.1977).

**6.** The Court will decline to exercise pendent jurisdiction over the state law claims against these and other defendants whom it has determined must be dismissed from all the federal law claims asserted against them.

must be "some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Carpenters*, 103 S.Ct. at 3356; *Griffin*, 403 U.S. at 102, 91 S.Ct. at 1798. This requirement is intended to give content to the Congressional purpose that the statute reach only conspiracies to deprive the *equal* protection of the laws or *equal* privileges and immunities. *Id.*

The moving defendants contend, for several reasons, that the conspiracy claim should be dismissed pursuant to Fed.R. Civ.P. 12(b)(6) because it is legally insufficient to state a cause of action under § 1985(3) against some or all of the defendants so charged.

### A. Discriminatory Animus

The complaint states that the alleged conspiracy was motivated by individiously discriminatory animus against "communists and/or advocates of equal rights for black people and/or labor organizers." The defendants argue that none of these alternatives is sufficient to fulfill the requirement that there be some racial, or otherwise class-based, invidiously discriminatory animus. The plaintiffs contend that each of the three alternative forms of discriminatory animus alleged satisfies the requirement.

The Supreme Court recently scrutinized the meaning of the discriminatory animus requirement in *Carpenters, supra*. That case arose out of a violent altercation between pro-union residents of Port Arthur, Texas and employees of a non-union-shop company that had recently settled in the area. The evidence showed that the pro-union residents made threats against the non-union employees on a number of occasions and that tension between the groups mounted and culminated in an incident in which the pro-union residents conspired to and did violently attack the non-union employees. 103 S.Ct. at 3355.

The non-union employees filed suit, under § 1985(3), against the unions and various pro-union individuals. The District Court found that the discriminatory animus requirement was satisfied. The Court of Appeals for the Fifth Circuit first found that the legislative history of § 1985(3) revealed an intent to reach "political animus" cases. It then concluded that animus against an economic group, such as employees of a non-union entity, was sufficiently similar to political animus so as to satisfy the requirement as well.

■ The Supreme Court in *Carpenters* declined to affirm the Court of Appeal's conclusion on political animus and reversed its conclusion on "economic or commercial animus." 103 S.Ct. at 3359. The latter holding is directly controlling of the instant complaint insofar as it alleges that the conspiracy was animated by the plaintiffs' status as labor organizers. As to that alleged basis for the discriminatory animus, the defendants' position is well taken.

■ At the other extreme, the language of *Carpenters* supports plaintiffs' contention that animus against "advocates of equal rights for black people" satisfies the requirement.

The *Carpenters* opinion describes *Griffin* with the following language:

> Because the facts in *Griffin* revealed an animus against Negroes *and those who support them*, a class-based, invidious discrimination which was the central concern of Congress in enacting § 1985(3), the Court expressly declined to decide "whether .... intent *other than racial bias* would be actionable."

103 S.Ct. at 3359 (emphasis added).

This passage indicates that the Supreme Court deems the phrase "racial bias" to include bias against supporters of blacks as well as against blacks directly.

In *Carpenters*, in discussing the legislative history of § 1985(3), the Court made the following remarks:

> it is a close question whether § 1985(3) was intended to reach any class-based animus other than animus against Negroes *and those who supported them most notably Republicans*..... The predominant purpose of § 1985(3) was to

combat the prevalent animus against Negroes *and their supporters. The latter included Republicans generally, as well as others, such as Northerners who came South with sympathetic views toward the Negro* . . . . . . Emphasis added. 103 S.Ct. at 3359.

The import of this language, though *dicta,* is clear: animus against advocates of equal rights for black people is within the scope of activity against which § 1985(3) is directed. Cases decided before *Carpenters* reached this result as well. *Richardson v. Miller,* 446 F.2d 1247, 1249 (3rd Cir.1971); *Pendrell v. Chatham College,* 386 F.Supp. 341, 348 (W.D.Pa.1974); *Peck v. United States,* 470 F.Supp. 1003 (S.D.N.Y.1979). *See also Novotny v. Great American Federal Savings & Loan Association,* 584 F.2d 1235, 1244 (3rd Cir. *en banc* 1978), *reversed on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979).

■ Animus against those who support the rights of black people is surely one of the badges of slavery against which the Thirteenth Amendment empowered Congress to act.[7] *See Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437–438, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968). The legislative history of § 1985(3) as summarized in *Carpenters* and its predecessors indicates a clear Congressional intent to reach conspiracies so motivated.

■ The Court holds that the "advocates of equal rights for black people" alternative provides the requisite animus al-

legation.[8] The Court notes, however, that to succeed on this ground the plaintiffs must prove that they were identifiable in the defendants' eyes as members of a class of advocates of equal rights for black people. Otherwise the defendants could not have singled them out as objects of a conspiracy on this ground. *See Rodgers v. Tolson,* 582 F.2d 315, 317 (4th Cir.1978). This is, nevertheless, a matter of proof, and not properly resolvable on motions to dismiss.

Finally, the plaintiffs allege, as a third alternative, that the defendants' animus against them was based on their status as communists. This claim would seem to require the Court to decide the question explicitly left open in both *Griffin* and *Carpenters,* to wit: whether § 1985(3) forbids "wholly non-racial, but politically motivated conspiracies." *Carpenters,* 103 S.Ct. at 3359.

After careful consideration, however, the Court has concluded it inappropriate to decide that issue at the current stage of these proceedings. The fact is that the animus against communists and advocates of equal rights for black people, in the instant case, may be inextricably intertwined. For instance, in describing certain background events to which the formation of the conspiracy is traced, the complaint states that "members and sympathizers of . . . a communist organization including several plaintiffs . . . organized a demonstration to protest Klan racism." Complaint, ¶ 29. It

---

7. It should be noted that the constitutional concerns that the Supreme Court addressed in the first part of its opinion in *Carpenters* and in *Griffin* are not raised by the facts of this case. The Constitution clearly provides Congress with sufficient power to act to punish conspiracies of the sort alleged herein. The role of the local police provides "state involvement" that would justify legislative enactments pursuant to the Fourteenth Amendment. *See Carpenters,* 103 S.Ct. at 3358; *Great American Federal Savings and Loan Ass'n v. Novotny,* 442 U.S. at 384, 99 S.Ct. at 2355 (Stevens conc.). The racial animus likewise would be sufficient to justify legislation on the authority of the Thirteenth Amendment. *Griffin; Jones v. Alfred H. Mayer Co.,* 392 U.S. 409, 437–438, 88 S.Ct. 2186, 2202, 20 L.Ed.2d 1189 (1968).

8. One basis for this conclusion is found in the language of § 1985(3) itself, which suggests that any person who is injured in his person or property as a result of a conspiracy of the prohibited type may bring suit under the statute, whether or not he is a member of the class against which the discriminatory animus was directed. *See* 42 U.S.C. § 1983; *Richardson v. Miller,* 446 F.2d 1247, 1249 (3rd Cir.1971); *Fralin & Waldron, Inc. v. County of Henrico,* 474 F.Supp. 1315, 1322 (E.D.Va.1979). Violence against advocates of equal rights for black people might reasonably be understood as third-party injury arising from discriminatory animus directed primarily at blacks, and only secondarily at their advocates.

further states that certain of the Klan and Nazi defendants met "to form a coalition for their attacks on communists and black people" and announced at that meeting the formation of the "United Racist Front." Complaint, ¶ 30. It then states that leaders of the communist organization "announced a protest march on November 3, 1979 [the rally at which the attack took place] against the white supremacism, race hate, and anti-labor organizing of the Klan and Nazi Party." Complaint, ¶ 31.

These allegations, as well as other portions of the complaint, indicate that the anti-communist bias attributed to the defendants may have been based at least in part on the communists' support for equal rights for black people. Indeed, plaintiffs' view of the facts suggests that the communists in the Greensboro area, at the time of the incidents complained of herein, played a role analogous to that of the Republicans who "championed [the] cause" of black people in the South during Reconstruction. *See Carpenters*, 103 S.Ct. at 3359.

If the evidence supports this view, then the conspiracy alleged herein would clearly be at the heart of the racially discriminatory activity that § 1985(3) is intended to forbid. *Id.* In that event, the Court will not need to consider the difficulties, to which *Carpenters* alluded, entailed in a determination that § 1985(3) reaches "every concerted effort by one political group to nullify the influence of . . . a competing group by use of otherwise unlawful means." 103 S.Ct. at 3359. If, on the other hand, the evidence indicates that the discriminatory animus, if any, that motivated the conspiracy(ies) was grounded solely on the plaintiffs' political associations, then the Court can resolve this issue upon motion at the appropriate time. Defendants' motions to dismiss on this ground will be denied.

## B. Federal Defendants

The federal defendants argue that federal officials are not subject to suit under 42 U.S.C. § 1985(3) or § 1986. Their argument is based partly on a line of case law originating with *District of Columbia v. Carter*, 409 U.S. 418, 93 S.Ct. 602, 34 L.Ed.2d 613 (1973), which they cite for the proposition that federal officials may not be sued under any statute derived from the Civil Rights Act of 1871.

In *District of Columbia v. Carter*, the plaintiffs brought suit against officials of the District of Columbia pursuant to 42 U.S.C. § 1983, not § 1985. The Court held that the D.C. officials could not be sued under § 1983. It relied in part on the language of the statute, which limited its scope to deprivations by "every person who, under color of any [law] *of any state or territory*. . . ." 409 U.S. at 419, 93 S.Ct. at 603 (emphasis added). In the Court's estimation, the District of Columbia was neither a state nor a territory.

The Court also relied in part on the legislative history of § 1983, which supported the conclusion that action by a state is a necessary element of a § 1983 action.

The Court's analysis of the legislative history focused primarily on § 1 of the 1871 Act, from which § 1983 was derived. The Court acknowledged that "threads of many thoughts" run through the legislative history of the entire 1871 Act. 409 U.S. at 426, 93 S.Ct. at 607. The Court did not purport to reach any conclusions on the legislative history of § 2 of the 1871 Act, from which § 1985(3) is derived. *Id.*

■■■ The defendants' attempt to expand *District of Columbia v. Carter's* holding to § 1985(3) actions must fail. The Supreme Court has held that Congress clearly intended in § 1985(3) "to speak of *all* deprivations of 'equal protection . . . ,' whatever their source," whether or not state action was present. *Griffin v. Breckenridge*, 403 U.S. at 97, 91 S.Ct. at 1796. The *Griffin* Court relied on the clear language of the statute, which, unlike § 1983, reaches to all conspiracies between "two or more persons," without reference to the status of those persons. 42 U.S.C. § 1985(3). Furthermore, the *Griffin* Court demonstrated that the source of Congress's power to enact § 1985(3) was not limited to cases in

which state action was present. 403 U.S. at 104–107.[9]

The defendants also argue that the legislative history of § 1985(3) itself compels the conclusion that the statute does not reach federal officials. They argue that it makes mention of federal officials only as potential victims intended to be protected by the Civil Rights Act, not as potential perpetrators of the violations in question. Because it makes no such mention, the federal defendants urge this Court to construe the statute as not reaching them.

The Court finds this argument thoroughly unconvincing. Neither the language of the statute nor common sense supports such a construction. Under that construction, a federal officer who conspires to deprive someone of the equal protection of the laws, and who does so with prohibited invidiously discriminatory animus, would be exempt from the liability under § 1985(3) to which his co-conspirators would be subject, merely because of his status. Certainly the federal government's immunity could not protect him when he is in violation of its laws. *See Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

With few exceptions, the cases holding that federal officials cannot be sued under § 1985(3) or § 1986 are pre-*Griffin*. They are based on the assumption (which *Griffin* rejected) that state action is a necessary element of such claims. *See, e.g., Bethea v. Reid*, 445 F.2d 1163 (3rd Cir.1971), *cert. den.* 404 U.S. 1061, 92 S.Ct. 747, 30 L.Ed.2d 749 (1971). The exceptional post-*Griffin* cases that reach this result rely on *District of Columbia v. Carter* without explaining how that case's holding on § 1983 can be stretched to § 1985(3) in light of *Griffin*. *Boykin v. District of Columbia*, 689 F.2d 1092, 1095, 1099 (D.C.Cir.1982); *Ryan v.*

*Cleland*, 531 F.Supp. 724, 733 (E.D.N.Y. 1982).

The Courts that have considered this issue in light of *Griffin* have consistently concluded that federal officers may be sued under § 1985(3) and § 1986. *Dry Creek Lodge, Inc. v. United States*, 515 F.2d 926 (10th Cir.1975), *cert. den.* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981); *Martinez v. Winner*, 548 F.Supp. 278, 329 (D.Colo.1982); *Peck v. United States*, 470 F.Supp. at 1012–1013; *Stith v. Barnwell*, 447 F.Supp. 970, 973 (M.D.N.C.1978); *Alvarez v. Wilson*, 431 F.Supp. 136 (N.D.Ill. 1977). Other courts apparently have simply assumed that federal officers could be sued under § 1985(3) and § 1986. *E.g., Hampton v. Hanrahan*, 600 F.2d at 634.

The federal defendants' motions to dismiss on this ground will be denied.

### C. Actionability of Cover-up

The moving defendants argue that the actions against them must be dismissed insofar as they are premised on the alleged cover-up of official involvement in the attack, because those allegations, even if true, do not give rise to any cause of action.

As against the defendants who are alleged to have joined the conspiracy *before* the attack, the plaintiffs may be able to prove that the cover-up was expressly part of their original conspiratorial plan. If so, the planned cover-up may have actually facilitated the attack itself, by encouraging the defendants to join in, in anticipation of impunity. On such proof, these defendants could be held to answer for the cover-up as part of a single conspiracy encompassing the dual objectives of the attack and the cover-up. *See Means v. City of Chicago*, 535 F.Supp. 455, 464 (N.D.Ill.1982); *Hampton v. Hanrahan*, 600 F.2d at 622; *cf. United States v. Krulewitch*, 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). In light

---

**9.** The Supreme Court may have limited *Griffin's* holding on this point somewhat in *Carpenters*, which held that in some types of § 1985(3) cases, *e.g.*, where no allegation of racial discrimination is made, "state involvement of some

sort" is required. 103 S.Ct. at 3358. That limitation does not affect the conclusion, however, that federal officials may be sued just as any other person may be, if the requisite constitutional power is present. *See* fn. 7 *supra*.

of this possibility, and of the requirement to view the complaint in the light most favorable to plaintiffs, dismissal of the cover-up allegations against these defendants would be inappropriate.

On the other hand, the defendants who are alleged to have joined the conspiracy only at the cover-up stage ("the cover-up defendants") cannot be held liable for the damages inflicted in the attack. Any relation-back theory, whereby these defendants might be held accountable for actions their co-conspirators took before they joined the conspiracy, must be rejected for the reasons articulated in *Silkwood v. Kerr-McGee Corp.*, 637 F.2d 743, 749 (10th Cir.1980), *cert. den.* 454 U.S. 833, 102 S.Ct. 132, 70 L.Ed.2d 111 (1981); *Guyton v. Phillips*, 606 F.2d 248, 251 (9th Cir.1979), *cert. den.* 445 U.S. 916, 100 S.Ct. 1276, 63 L.Ed.2d 600 (1979). "[P]ersons who participate in the concealment are not *ipso facto* participants in the original conspiracy." *Hampton v. Hanrahan*, 600 F.2d at 622. If the cover-up defendants can be held liable at all, it can only be for some actionable injury that was inflicted after the attack on those plaintiffs who survived the attack.[10]

The remaining issue, then, is whether the surviving plaintiffs have alleged that the cover-up caused them some actionable post-attack injury.

The complaint charges liability for the conspiracy(ies) under § 1983, under § 1985(3), and in a *Bivens* action. To state a claim under § 1983 and *Bivens*,[11] the plaintiffs must allege, *inter alia*, that the cover-up deprived them of a right protected by the Constitution or laws of the United States. Under § 1985(3), they must allege, *inter alia*, that the purpose of the cover-up conspiracy was to deprive the targeted class "of the equal protection of the laws, or of equal privileges and immunities under the laws," and that some overt act in furtherance of this conspiracy caused injury to the plaintiffs in their persons or property or deprived them of some right of citizens of the United States.

According to the defendants, the gist of the cover-up claim is that the Klan/Nazi perpetrators of the attack were not properly prosecuted. If this were the plaintiffs' sole claim, then the cover-up would not have deprived them of anything to which they are legally entitled, because the law gives them no justiciable interest in the prosecution or non-prosecution of others. *See Leeke v. Timmerman,* 454 U.S. 83, 87, 102 S.Ct. 69, 71, 70 L.Ed.2d 65 (1981); *Linda R.S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973). In that event, the defendants' motion would be well-taken.

The plaintiffs argue not with defendants' statement of the law, but rather with their characterization of the complaint. The cover-up claim, so the plaintiffs contend, is not based solely on an alleged deprivation of a right to have the Klan/Nazi defendants prosecuted. Rather, the cover-up, of which the prosecutorial shortcomings were but one part, deprived them of their First and Fourteenth Amendment rights by chilling and deterring their right to assemble, travel, petition, and speak, and their right of access to the courts.

The complaint itself indicates that the cover-up entailed the arrest of certain of the plaintiffs on baseless charges and the failure to dismiss those charges until the Klan/Nazi defendants were acquitted in state court. It also states that the cover-up was intended to "discourage cooperation

---

**10.** No claims whatsoever may be made against the cover-up defendants on behalf of the five persons who died in the attack, as the plaintiffs now concede. Their civil rights died with them, and nothing done after their deaths could constitute a deprivation. *Silkwood v. Kerr-McGee Corp.*, 637 F.2d at 749; *Guyton v. Phillips,* 606 F.2d at 251.

**11.** In the absence of special factors counselling hesitation, none of which have been urged on the Court, the *Bivens* remedy sought herein against the federal defendants charged in the conspiracy is assumed to be available and to require, for all practical purposes, the same elements of proof as the § 1983 remedy sought against the state and local officials charged in the conspiracy. *See Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979).

with plaintiffs' efforts to gain public support and legal redress for the injuries and murders," Complaint, ¶ 56, and to "create an atmosphere of fear and hostility toward plaintiffs." Complaint, ¶ 58.

The Court is precluded, by adherence to the standard in which the complaint must be viewed in considering motions premised on Fed.R.Civ.P. 12(b)(6), from accepting the limited interpretation of these allegations that the defendants have urged. The reference to hindering plaintiffs' efforts to gain "legal redress" encompasses the effect of the cover-up on plaintiffs' own civil suit as well as on the public prosecutions arising out of the attack. A fair implication of the complaint is that the cover-up was at least partially successful in hindering plaintiff's efforts in this regard. If the cover-up was designed to and did deprive plaintiffs, to some extent, of their own civil causes of action, then it may have infringed on a protected constitutional right and denied plaintiffs the equal protection of the laws. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428, 102 S.Ct. 1148, 1153, 71 L.Ed.2d 265 (1982) (a cause of action is a form of "property" that the state may not take away without due process of law); *Barrett v. United States*, 689 F.2d 324, 332 (2nd Cir.1982), *cert. den.* — U.S. ——, 103 S.Ct. 3111, 77 L.Ed.2d 1366 (1983) (cover-up allegations stated claim under § 1983 for deprivation of plaintiffs' property interest in a Federal Tort Claims Act claim premised on acts of persons whom cover-up had protected); *Landrigan v. City of Warwick*, 628 F.2d 736, 744 (1st Cir.1980) (cover-up can give rise to cause of action for deprivation of right of access to courts, but not where plaintiff has already prevailed on and received full compensation for underlying claim); *Lenard v. Argento*, 699 F.2d 874 (7th Cir.1983), *cert. den.* — U.S. ——, 104 S.Ct. 69, 78 L.Ed.2d 84 (1983); *Means v. City of Chicago*, 535 F.Supp. at 464; *Bell v. City of Milwaukee*, 498 F.Supp. 1339, 1343–1344 (E.D.Wisc.1980).

In addition, the cover-up may have caused the plaintiffs actionable injury if it led to the false arrests and the maintenance of false charges against the plaintiffs. *See Hampton v. Hanrahan*, 600 F.2d at 621–623; *Hampton v. City of Chicago*, 484 F.2d 602, 610 (7th Cir.1973), *cert. den.* 415 U.S. 917, 94 S.Ct. 1413, 39 L.Ed.2d 471 (1974).[12]

The plaintiffs may have great difficulty proving that they were damaged significantly in these respects. The very fact that they were able to institute this suit goes a long way toward proving that the conspiracy to prevent them from obtaining legal redress was unsuccessful, if indeed there was such a conspiracy. *See Landrigan v. City of Warwick*, 628 F.2d at 744. The plaintiffs, of course, were not entitled to have the defendants do investigatory work for them, nor to have the defendants notify them of the existence of a cause of action. Only affirmative acts of cover-up would be unlawful. *See Peck v. United States*, 470 F.Supp. at 1019 and cases cited therein. As to the false arrests, proof of causation is likely to be difficult, and the fact that the charges were never actively pressed may seriously undercut proof of damages.

Nevertheless, the Court cannot say that the plaintiffs can prove no set of facts in support of these contentions that would entitle them to relief. The extent and nature of their damages, if any, from the cover-up is a factual question that cannot properly be resolved on motions to dismiss. *See Hampton v. City of Chicago*, 484 F.2d at 609–610; *see also Palmer v. Hudson*, 697 F.2d 1220, 1225 (4th Cir.1983) (nominal damages may be awarded for violations of substantive constitutional rights), *cert. granted* — U.S. ——, 103 S.Ct. 3535, 77 L.Ed.2d 1386 (1983). If the defendants desire more specificity as to how the plaintiffs claim to have been damaged by the cover-up, they may take advantage of the many discovery tools available for that pur-

---

12. Note that the false arrest charges may be independently actionable under § 1983. *See Pierson v. Ray*, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967); *Pritchard v. Perry*, 508 F.2d 423 (4th Cir.1975).

pose. Their Rule 12(b)(6) motions regarding the cover-up allegations must be denied.

## FAILURE TO PROTECT

Count Three of the complaint charges the Greensboro police defendants under § 1983 with failure to protect the plaintiffs in the exercise of their First Amendment rights. The complaint apparently charges the FBI and BATF defendants under this theory as well, as part of the *Bivens* action contained in Count Ten. Additionally, Count Six charges the Greensboro police defendants, the informant defendants, and the FBI and BATF defendants with violations of 42 U.S.C. § 1986, arising out of their failure to prevent the § 1985(3) conspiracy from achieving its object, despite their power to do so and their knowledge of its existence.

 The defendants argue that the plaintiffs have no protected right to police protection. A police officer's duty to keep the peace, they argue, is a public duty only, and a breach thereof does not give rise to a private right of action. *South v. Maryland ex rel Pottle,* 59 U.S. (18 How.) 396, 15 L.Ed. 433 (1855); *Fox v. Custis,* 712 F.2d 84, 88 (4th Cir.1983); *Bergmann v. United States,* 689 F.2d 789, 795 (8th Cir. 1982); *Amato v. United States,* 549 F.Supp. 863 (D.N.J.1982).

The defendants' position is a correct statement of the general rule. There are, however, a number of exceptions. One is that dissenters, such as civil rights demonstrators, are entitled to police protection in the course of lawful pickets, assemblies, etc., as an adjunct to their First Amendment rights, their right to interstate travel, and their Equal Protection rights. *E.g., Glasson v. City of Louisville,* 518 F.2d 899, 906 (6th Cir.1975), *cert. den.* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Wolin v. Port of New York Authority,* 392 F.2d 83 (2nd Cir.1968), *cert. den.* 393 U.S. 940, 89 S.Ct. 290, 21 L.Ed.2d 275 (1968); *Kelly v. Page,* 335 F.2d 114, 119 (5th Cir. 1964); *Catlette v. United States,* 132 F.2d 902, 907 (4th Cir.1943); *Williams v. Wallace,* 240 F.Supp. 100 (M.D.Ala.1965);

*United States v. Ku Klux Klan et al.,* 194 F.Supp. 897, 902 (M.D.Ala.1961).

 According to the complaint in the instant case, the police had advance knowledge of the time and location of the rally scheduled for November 3, 1979, and the rally was widely known to be for the purpose of expressing opposition to the Klan's racist and anti-labor attitudes. The police had advance knowledge that the Klan was planning to attack the rally, and, in furtherance of a conspiracy between the police and the Klan, the police defendants failed to arrive at the rally site until well after the attack took place, allowing the violence to go unchecked and many of the perpetrators to flee.

These allegations are strikingly similar to the facts in *United States v. Ku Klux Klan, supra.* There, the Montgomery Police Department had advance knowledge that two busloads of "Freedom Riders," white and black college students demonstrating their opposition to racism, would be arriving at the city limits on a given day. They knew the approximate time of arrival. They knew that the Freedom Riders had encountered violent attacks from the Klan and its sympathizers in other cities, and they also knew the likelihood of violence in their own city. Despite that knowledge, they failed to take any precautions. The Court held that the failure to protect deprived the Freedom Riders of equal protection and due process of law.

The Court concludes that the instant case states a cause of action under this exception against the Greensboro police officials. However, police protection is an obligation generally reserved to the local government level, within typical governmental patterns in the United States. *See Kelly v. Page,* 335 F.2d at 119. The plaintiffs have not provided any authority suggesting that federal law enforcement officials have any legal responsibility to protect those expressing unpopular views. The Court concludes that the plaintiffs have no *Bivens* cause of action against the federal defendants on this theory.

A further arguably relevant exception to the general rule is of common law origin. The Restatement of the Law, Torts 2d, § 319 states as follows:

One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.

█ Though not applicable to the instant case, for the reasons which follow, this common law theory has upon occasion been asserted as a basis for holding the FBI or other agencies of the federal government liable for the actions of informants or other alleged "agents" who were not properly screened, trained, or otherwise controlled. *See, e.g., Liuzzo v. United States,* 508 F.Supp. 923, 934–935 (E.D.Mich. 1981); *see also Peck v. United States,* 470 F.Supp. at 1017; *Bergmann v. United States,* 689 F.2d 789 (8th Cir.1982). Reliance on such an approach in the instant case is misplaced, however, for the plaintiffs have not brought their claims pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* Except pursuant to that statute, the federal government and its agents are absolutely immune from asserted breaches of common law duties. Each of the cases cited *supra* involved FTCA claims.

█ Finally, 42 U.S.C. § 1986 creates, in effect, a statutory exception to the rule that there is no private right to police protection. That statute provides as follows:

Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in Section § 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured .... for all damages caused by the act, which such person by reasonable diligence could have prevented; ....

In the circumstances outlined, a police officer has a statutory duty, just as any private citizen does, to take reasonable steps to prevent a § 1985(3) conspiracy.

█ The instant complaint sufficiently alleges the statutory prerequisites. As the Court found *supra,* the complaint sufficiently alleges the § 1985(3) conspiracy. The allegation that the defendants had the power to prevent, or to aid in preventing, the effectuation of the conspiracy is somewhat conclusory, but their employment as law enforcement officials obviates the need for much specificity on that score. If the evidence establishes the existence of the § 1985(3) conspiracy and their advance knowledge of it, then whether or not they had the power to prevent its effectuation becomes an issue of proof.

The federal agents are susceptible to suit under § 1986 just as are the Greensboro police defendants. Their argument that they cannot be sued under the Civil Rights Act of 1871 has been addressed and rejected, *supra.*

In summary, the motions to dismiss Counts Three and Six will be denied. Count Ten will be dismissed insofar as it purports to hold the federal defendants liable for breaching a duty to protect the plaintiffs.

*§ 1981*

Count Seven of the complaint alleges a cause of action against virtually all of the defendants for violation of 42 U.S.C. § 1981, asserting that the defendants "have deprived plaintiffs of their equal rights, privileges, and immunities on the basis of their support for equal rights of black people and for integration through anti-racist labor organizing of black and white workers." The defendants seek dismissal of Count Seven under *Fed.R.Civ.P.* 12(b)(6), contending that the complaint fails to state a claim under § 1981.

Section 1981 of Title 42 of the U.S.Code reads in pertinent part as follows:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and

enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property *as is enjoyed by white citizens, ....*

42 U.S.C. § 1981 (emphasis added).

■ Standing issues aside, a complaint cannot state a cause of action under § 1981 unless it alleges that some non-white person was deprived of rights enumerated in § 1981 *because of his or her race.* This is the intent of the phrase "as is enjoyed by white citizens" which appears in § 1981 and § 1982 but not in § 1983 or § 1985(3). *See Jones v. Mayer Co.,* 392 U.S. at 421, 88 S.Ct. at 2193–2194 ("so long as a Negro citizen who wants to buy or rent a home can be turned away *simply because he is not white,* he cannot be said to enjoy 'the same right ... as is enjoyed by white citizens'....") (emphasis added).

■ The language of § 1981, unlike that of § 1985(3), simply is not capable of being construed to protect supporters of black people as well as black people themselves. Nor do the authorities on which the plaintiffs rely suggest otherwise.

Plaintiffs apparently read *Sullivan v. Little Hunting Park, Inc.,* 396 U.S. 229, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) as creating a § 1981 or § 1982 cause of action for anyone who is, in any way, punished for advocating the rights of blacks. That reading is incorrect. The complaint in *Sullivan* clearly alleged that a non-white person had been deprived of a right enumerated in the statute (in that case, § 1982) because of his race. The issue there was whether his white colleague, who had also been hurt, had standing to sue to vindicate his non-white colleague's § 1982-protected rights. 396 U.S. at 237, 90 S.Ct. at 404. The inquiry into the white plaintiff's alleged injury in *Sullivan* and its progeny is for the purpose of determining whether the white plaintiff has enough personal stake in the matter to assure that, if he is allowed to sue on behalf of a non-white colleague's rights, he can be expected to as-

sert them vigorously. Never has the Supreme Court suggested that § 1981 or § 1982 give a white person any rights of his own. *See Mackey v. Nationwide Insurance Companies,* 724 F.2d 419 (4th Cir. 1984); *Scott v. Greenville County,* 716 F.2d 1409 (4th Cir.1983).

■ The rights of non-white persons arguably come into play in two ways on the facts of this complaint. First, at least four of the plaintiffs are non-white. The complaint does not allege, however, that they were deprived of any rights enumerated in § 1981 because of their race. The deprivations are alleged to have occurred because of their views—i.e. because they, like the white plaintiffs, advocated for equal rights for blacks. The complaint makes no differentiations between the non-white and white plaintiffs whatsoever.

Second, a larger group of non-whites can be said to have played a different role, albeit a passive one. That group consists of the unnumbered and unnamed black people on behalf of whose general civil rights the plaintiffs allegedly were advocating. Even if *Sullivan* and its progeny might somehow be stretched to grant the plaintiffs standing to bring a cause of action on behalf of this all-inclusive group, the complaint alleges no facts to support a claim that members of this group have been denied any of the rights enumerated in § 1981.

The complaint having failed to allege a § 1981 violation on behalf of anyone, plaintiffs or otherwise, Count Seven will be dismissed.

## SUPERVISORY PRACTICES

■ The defendants in the supervisory practices counts (Counts Five and Ten) correctly argue that they cannot be held liable for the misconduct of their subordinates under the doctrine of *respondeat superior.* Liability under § 1983 and *Bivens* [13] will lie against a supervisory official only if he or she acted personally in the deprivation of the plaintiffs' rights. *Vinnedge v. Gibbs,* 550 F.2d 926, 928 (4th

---

**13.** *See* n. 11, *supra.*

Cir.1977). Similarly, a municipality can be held liable under § 1983 only if its employees' unconstitutional acts implemented or otherwise represented the municipality's unconstitutional official policy or custom. *Monell v. New York City Department of Social Services*, 436 U.S. 658, 690–694, 98 S.Ct. 2018, 2035–2037, 56 L.Ed.2d 611 (1978). The doctrine of *respondeat superior* as a basis of the liability of either an individual or a municipality has been expressly rejected. *Polk County v. Dodson*, 454 U.S. at 325, 102 S.Ct. at 453; *Vinnedge v. Gibbs*, 550 F.2d at 928.

■■■■■ However, officials and municipalities may be held liable for their omissions as well as their commissions. *Wellington v. Daniels*, 717 F.2d 932, 935–936 (4th Cir.1983); *Avery v. County of Burke*, 660 F.2d 111, 114 (4th Cir.1981); *Withers v. Levine*, 615 F.2d 158, 161 (4th Cir.1980), *cert. den.* 449 U.S. 849, 101 S.Ct. 136, 66 L.Ed.2d 59 (1980). Inaction and omissions are actionable if, and only if, they constitute "tacit authorization" of, or deliberate indifference to, the constitutional injuries. *Wellington v. Daniels*, 717 F.2d at 935. Additionally, the defendants herein can be held liable for their supervisory practices, whether in the form of commissions or omissions, if and only if those practices are found to have directly contributed to the plaintiffs' injuries. *See Duchesne v. Sugarman*, 566 F.2d 817, 832 (2nd Cir.1977).

■■■■ Generally a single, isolated incident of wrongdoing on the part of a subordinate has been held insufficient to establish supervisory inaction of a constitutional magnitude. This is because knowledge of the potential for abuse generally may not be imputed to the supervisory personnel unless there has been a history of widespread abuse. *Wellington v. Daniels*, 717 F.2d at 936. However, the Court is satisfied that evidence that a supervisor had specific advance knowledge of a planned abuse, and acquiesced therein, would supply a basis for finding that the supervisor "tacitly authorized" the planned abuse, even absent a history of abuse. Similarly, a discrete act of a city official may be a sufficient basis on which to hold a city liable, if the evidence shows that the act in fact did represent official policy. *See Himmelbrand v. Harrison*, 484 F.Supp. 803, 810–811 (W.D.Va.1980) (written statement by city attorney, purporting to state the position of the city, constitutes city policy).

■■■■ The instant complaint focuses primarily on a single incident. However, it makes reference to a number of previous incidents of similar, though less extreme, nature. Additionally, most of the supervisory personnel who are now before the Court are alleged to have had specific advance knowledge of their subordinates' planned misconduct. The City of Greensboro, to whom this latter generalization does not apply, is alleged to have issued proclamations after the attack, approving its subordinates' actions. While an after-the-fact statement might not in and of itself make the proclaiming official or agency responsible for the actions so approved, the statement may support a contention that the official or agency tacitly authorized the abuse or was deliberately indifferent to it, especially if the statement is offered in conjunction with evidence that at the time the statement was made, the person or agency making it knew of the subordinates' wrongdoing. *Compare Orpiano v. Johnson*, 632 F.2d 1096, 1102 (4th Cir. 1980), *cert. den.*, 450 U.S. 929, 101 S.Ct. 1387, 67 L.Ed.2d 361 (1980) (difficult to find deliberate indifference where evidence showed prison superintendent promptly investigated charges of wrongdoing and took appropriate disciplinary action) *with Himmelbrand v. Harrison*, 484 F.Supp. at 810 (city officials liable along with police chief where they ratified—in writing—his challenged decision).

The claims in the instant case that the supervisory practices were constitutionally defective may be difficult to prove. Indeed, such claims are rarely successful on the merits. *E.g., Wellington v. Daniels*, 717 F.2d 932; *Orpiano v. Johnson*, 632 F.2d 1096. Nevertheless, this observation does not support dismissal at the pleading stage. In the two cases cited, allegations

no more specific than those made in the instant case had been allowed to proceed to trial. It cannot now be determined whether the plaintiffs will be able to produce evidence of widespread practices or advance knowledge that would tend to indicate that the supervisors acted personally in the alleged deprivations. *See Davis v. Zahradnick*, 600 F.2d 458, 459 (4th Cir. 1979) (inmate's verified complaint, alleging warden failed to control his subordinates and thereby caused plaintiff's injury, raised triable issues of fact). Assuming, as the Court now must, that the allegations of the complaint are true, the motions to dismiss the supervisory practices claims must be denied, except as discussed *supra* regarding the insufficiency, under Fed.R.Civ.P. 8(a), of the pleadings against certain of the defendants.

## CITY NOTICE PROVISIONS

■ The City of Greensboro contends that all claims against it must be dismissed because the plaintiffs failed to give the City sufficient written notice of claims against it within six months after the cause of action arose, as, the City contends, *N.C. G.S.* § 1–539.15 required.

The City concedes that twelve of the sixteen plaintiffs filed notices but argues that the notices they filed lacked sufficient particularity. The Court finds that the twelve plaintiffs who filed notices substantially complied with the statutory requirement. The statute requires no more. *Miller v. City of Charlotte*, 288 N.C. 475, 219 S.E.2d 62 (1975).

■ The state law claims of the four plaintiffs who failed to file the required notices (Cannon, Allen Blitz, Dori Blitz, and Russell) must be dismissed for failure to comply with this provision. The state law cannot, however, bar their federal law claims. Federal courts look to state law to fill in gaps in the federal law governing civil rights actions, *e.g.* to supply a statute of limitations where none exists in the federal law. But state law may not be used to impose a condition precedent on such actions that federal law does not require, especially if its imposition would be incon-

sistent with the federal policy underlying the causes of action.

Other courts have consistently held that similar notice provisions do not apply to federal civil rights suits. *Rosa v. Cantrell*, 705 F.2d 1208, 1221 (10th Cir.1982); *Williams v. Posey*, 475 F.Supp. 133 (M.D.Ga. 1979); *Perrote v. Percy*, 452 F.Supp. 604 (W.D.Wisc.1978); *Glover v. City of New York*, 401 F.Supp. 632 (E.D.N.Y.1975). This Court agrees. The City's motion will be denied as to the federal claims.

## STATE LAW CLAIMS

■ The final four counts of the complaint purport to state causes of action under several provisions of North Carolina tort law. Count Eleven charges all the defendants with wrongful acts in violation of *N.C.G.S.* § 28A–18–1 and 2. Count Twelve charges the Klan and Nazi defendants and informant defendant Dawson with assault and battery. Counts Thirteen and Fourteen charge Greensboro city and police defendants with arresting certain of the plaintiffs without probable cause and with abuse of criminal process.

The defendants argue that these counts are fatally conclusory and, alternatively, that the Court should decline to exercise pendent jurisdiction over them.

The Court will decline to exercise jurisdiction over these counts insofar as they make claims against the defendants who are being dismissed from the federal law counts. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Court will continue the motions on behalf of the remaining defendants under advisement.

## CONCLUSION

The Court has considered other grounds for dismissal asserted in the briefs and finds them meritless.

The moving defendants suggest repeatedly in their memoranda that their inclusion as defendants in this action is frivolous, vexatious, and totally lacking in factual basis.

The Court admonishes plaintiffs' counsel, in consultation with their clients, to take seriously their obligations under Fed.R. Civ.P. 11 and to seek voluntary dismissal of any one or more of the defendants against whom they cannot affirm their belief that the complaint is well grounded in fact and law. The complaint brings serious charges against a number of public servants who occupy positions of public trust. Each of them, as well as each of the private defendants, is individually entitled to the protection from baseless lawsuits that Rule 11 contains. At this stage, the Court must rely on plaintiffs' counsel to assure them that protection. If the Court's reliance is shown to be misplaced, it is to be borne in mind that the Court is not powerless to assess sanctions against counsel as well as litigants. Until shown otherwise, the Court will maintain its faith in those members of the bar participating in this cause.

■■■■■ In addition, the Court is empowered to order plaintiffs to pay the attorneys' fees of defendants who prevail in a civil rights action, should it determine at the conclusion of the suit that the suit was frivolous, vexatious, or brought for harassment purposes. 42 U.S.C. § 1988; *Lopez v. Aransas County Independent School District*, 570 F.2d 541 (5th Cir.1978). If some but not all of the defendants prevail, the prevailing defendants would not be barred from arguing that the suit was frivolously brought against them, even if it was meritoriously brought against one or more of their co-defendants.

The Court having found that the complaint satisfies the legal requirements to survive a motion to dismiss (except as heretofore discussed), the Court can respond to the defendants' charges of frivolousness at this stage only with the hope that Rule 11, 42 U.S.C. § 1988, 28 U.S.C. § 1927 and the Court's inherent power will serve their intended deterrence purposes. Further relief must await development of the facts.

## APPOINTMENT OF COUNSEL

Fifteen of the twenty persons named as Klan or Nazi defendants have filed appearances *pro se*, as has defendant Dawson. All but one have requested that counsel be appointed to represent them. They have not supplied the Court with information on their financial conditions, other than their own representations that they are unable to afford counsel.

■■■■■ The Court is empowered [14] under 28 U.S.C. § 1915 to request counsel to represent these defendants only if it determines that they indeed are unable to pay for counsel themselves. Such a determination cannot be made on the record now before the Court. Even if the necessary information were available and such a determination were made, the law is well-settled that counsel should be appointed in civil actions only in exceptional circumstances. *Cook v. Bounds*, 518 F.2d 779 (4th Cir.1975). If it is apparent to the court that a *pro se* litigant has a colorable claim [or defense] but lacks capacity to present it, the court should appoint counsel. *Gordon v. Leeke*, 574 F.2d 1147, 1153 (4th Cir.1978), *cert. den.* 439 U.S. 970, 99 S.Ct. 464, 58 L.Ed.2d 431 (1978).

■■■■ It is not apparent to the Court that the *pro se* defendants have a colorable claim on their counterclaims. As to the counterclaims the motions will be denied.

Nor is it apparent to the Court at this time that any of the *pro se* defendants lacks capacity to present his own defense in this action. The Court notes that the *pro se* defendants will benefit to some extent from the efforts of counsel for their represented co-defendants, whose legal interests overlap their own to a large degree. The factual issues raised herein are not so complicated that a *pro se* defendant of ordinary physical and mental capacities would be unable to represent himself fairly. There is nothing now before the Court to suggest that any of the *pro se* defend-

---

**14.** The Court is empowered to appoint counsel only in the sense that it is empowered to direct, or request, counsel to represent indigents without compensation. In a civil case the Court has no power to order fee-paid representation for indigent, unrepresented parties.

ants lacks ordinary physical and mental capacities, or that any of them is illiterate or otherwise at a particular disadvantage in defending this suit *pro se.* Accordingly, their motions for appointment of counsel to represent them in the defense of this action will be denied. The Court suggests that they contact their local legal aid offices, who may be able to provide them free representation if they meet the applicable indigency requirements.

If at some future time it becomes apparent to the Court that one or more of the defendants lacks capacity to represent himself in this action, the Court will reconsider its ruling.

An appropriate order will issue, and the present stay on discovery will, except as noted *infra,* be lifted.[15]

---

**15.** The Court has determined *sua sponte* that it need not further stay discovery against the government officials pending a separate "threshold inquiry" regarding qualified immunity defenses that they may raise. Discovery in this action has already been stayed, at the defendants' behest, for almost two years. In any event, even assuming *arguendo* that such defenses had been properly raised, the Court finds that they would be unsuccessful on the current state of the record.